Our next case for argument is Atlas Biologicals v. Kutrubes. We're ready to hear from the appellant. Good morning, your honors. My name is Kevin Ward. I represent the appellants, Thomas James Kutrubes in this matter, and Peak Serum. This, despite the lengthiness of the time frame in this case, the case initially was filed in March of 2015, went to trial in 2018, and as the court has seen, there's extensive appendix comprising some 3,400 pages or so. But despite all that, I think the issues in this matter are fairly simple. The appeal in this instance focuses on the court's award for the claims under false designation of origin and unfair competition, and then also the state claim, which is a misappropriation of trade secrets. Now, as I noted, the complaint was initially filed in early 2015. The case was tried in March of 2018, and then September 23rd of 2019, that's over a year and a half after trial, the district court issued its findings of fact and conclusions of law. The reason why I point out the fact that there was a long delay in issuing a decision, I think that has some bearing on this case, because it seems apparent that the district court forgot what a lot of the evidence is or was. I read a footnote in that decision that sort of put the blame on Atlas. Well, I agree that that footnote is there, but I also, I think the passage of time was detrimental overall to the parties and specifically to my clients. Well, nonetheless, let's proceed to the merits. Just a bit of background, I don't want to dig in too much the details because I want to get to some of the major points, but Mr. until December of 2014. Thereafter, he began actively marketing and selling products through his company, Peak Serum. Both Atlas and Peak Serum are engaged in the bovine serum industry, and that's what led to these competition claims. Now, it's undisputed that prior to his separation from employment in 2014, Ketrubis had engaged in marketing efforts. He was marketing product to Atlas customers for his future company, Peak Serum. That's undisputed. The emails are there. In those emails, Mr. Ketrubis had indeed utilized the trademarks and trade names of Atlas Biologicals. He was emailing from his Atlas Biologicals account. As well, it's not in contention here that prior to leaving Atlas, he had forwarded to himself significant information relating to customers of Atlas and documentation that was property of Atlas. That's not in dispute here. And you're not disputing that that database is a trademark? Well, Your Honor, that was something that was contested at trial, whether that was trade secret information, and we're not contesting that now in this appeal. But what I would want to note for the court is that there was no evidence at trial to indicate that Mr. Ketrubis had actually lifted the entire database from Atlas. That was not a finding. Why did you point that out? I mean, is that something that we should weigh? I just brought it up because Judge Briscoe had indicated that the database had been taken, and that wasn't the case. What had been taken was customer information, sales sheets, and items that, in part, that Mr. Ketrubis had compiled as an employee. Now, what is clear based upon the evidence at trial is that those misrepresentations in terms of Mr. Ketrubis representing to third parties, that there was some relationship or sister relationship between Peak Serum and Atlas, that ceased as of December of 2014. When he left employment there, there's no indication that those type of misrepresentations carried on beyond that point and into his work with Peak Serum. But you don't think that Mr. Ketrubis created actual confusion in the last quarter of 2014 with Atlas prior to his separation from the company? I think the evidence is clear, and that was conceded by Mr. Ketrubis in his testimony that, yeah, that misconduct certainly had the potential for creating confusion. Did I answer your question there? Well, I think so, but my question was really about actual confusion. You don't dispute actual confusion prior to the end of 2014, right? We do dispute the extent of actual confusion. Okay. Yeah, the court indicated that there was an email that expressed confusion prior to 2015, and that was in an email to one of the customers by the name of Dame Young. And that information about Dame Young will be presented further on here as well. But, yes, there was one instance of confusion that the court keyed in on. There was no evidence at trial to indicate that Peak Serum or Tom Ketrubis had marketed or sold any product prior to leaving Atlas. In fact, the evidence indicated that Peak Serum had no product until after he had left. Why do we care about that? Your Honor, what I'm pointing out is just that there's a distinction between actions which occurred during the time when Mr. Ketrubis was an employee and when he was – and after he left employment. And so does that key into the damage award? Or, again, I don't know why we care. I know there's a lot of discussion like that in the briefs about what was sold, when it was sold. Your Honor, the focus here – and I can move on and get to those points. But when it comes to the false designation of origin and unfair competition claim, as you're aware, there was a significant damages award of $684,000 and change, plus reasonable attorney's fees. Now, what a plaintiff has to prove when they're forwarding a claim for false designation of origin, they need to establish that the defendant made false or misleading representations, descriptions, and designations of origin. Number two, that the deception was likely to cause confusion among ordinarily prudent consumers as to the origin of the defendant's goods and the defendant's affiliation with the plaintiff or the plaintiff's approval of those goods. And then additional elements are that the defendant caused the deception to enter into commerce and that the plaintiff was damaged by deception. Now, the issue here is that there was no evidence at trial to indicate that there was confusion among customers as to the origin of defendant's goods or defendant's affiliation with plaintiff or the plaintiff's approval of defendant's goods after 2000 – or in 2015 when Mr. Ketrubis and his company, PXIRM, were actually marketing and selling product. Hypothetically, I'm selling FBS, and I say I am affiliated with Atlas. And then, say, Mr. Dane Young or someone then starts, oh, there's Bob Bacharach. He's a legitimate player in this industry. And then I get their interest, and we start talking prices. They're interested. And then I and Atlas say, you know what? I was kidding. I'm really not associated with Atlas. But they say, well, I don't care. You know, you've got a good product. I like your prices. You sell below the same price for equivalent product. Bacharach, I'm going to buy from you. Isn't that the classic initial interest confusion that is cognizable under the Lanham Act? And isn't that exactly what we have here? Your Honor, I agree that that's potentially a situation that's cognizable under the Lanham Act, but I don't agree that that's what happened here. And since you brought up the issue of Dane Young, we can talk specifically about that company because there were significant sales made to that company. Dane Young was included in the court's decision as one of those emails where there was an actual confusion expressed, but the record also demonstrated that there was no confusion thereafter. Dane Young continued to Well, but wasn't there evidence that he was contacted by your client while your client was working for Atlas and represented that he was working for Atlas? There was, yes, there is communication that at the time. We're right back into Judge Bacharach's scenario, aren't we? They get the hook, and away we go, and we have future business with you. All's good. Well, a couple things, Your Honor, that are relevant and that were clear within the evidence when it comes to Dane Young, and that's that, first off, Dane Young had not been a customer of Atlas for fetal bovine serum for at least several years. Now, that was even acknowledged by Again, does that matter? I mean, it's a related product, and you're selling it for less than the product that is branded by Atlas. I mean, wouldn't that be attractive to them? Well, it's not a related, I mean, they're different products. Used for the same thing, right? Used for the same thing for research? Now, Dane Young had been purchasing Fetal Plus, which is a proprietary product to Atlas. They had not been purchasing fetal bovine serum. In fact, Dane Young was even trying to continue to do business and purchase product from Atlas. Atlas refused them and then terminated the relationship. Now, there was a voluntary termination of that relationship. Dane Young then went to Ketrubis and asked if they could purchase product, and then thereafter, product was sold to Dane Young. That product was sold some six months after Ketrubis had left his employment. Now, I think it's important to note that, and it was abundantly clear in the evidence, that that was a voluntary termination by Atlas. Now, what the district court did is, basically, even though there was no indication of confusion by Dane Young as to any relationship between Ketrubis and Atlas at the time it purchased product, I mean, that's indicated just by the fact that Atlas was the one who terminated the relationship. The other thing that I want to point out when it comes to the issue of Dane Young is that Dane Young was one of the customers who purchased some mislabeled serum product as well. Now, I want to talk about this issue of mislabeling because the district court provided no analysis whatsoever as to how mislabeling was somehow damaging to Atlas. Well, the mislabeling reference that I saw in the order was that there was mislabeling and the product somehow was affecting the relationship between Atlas and Atlas customers. Well, that's not correct. First off, when it comes to Dane Young, that's a customer that Atlas had actually terminated. But when it comes to customers generally who may have purchased mislabeled product, there was no evidence of trial. I mean, I just can't point you to any evidence in the record to indicate that any customer was somehow confused by the mislabeling as to some relationship between Atlas and Atlas. The language in the opinion at page 31 is Atlas requests that the court award if the profits peak serum gained from selling mislabeled lots to Atlas's customers and that the court triple that portion of the award. So, the court was looking at selling of mislabeled lots to Atlas's customers. Understood, Your Honor. But the problem with that is under the Lanham Act, the damages result from some deception or confusion as to a relationship between those parties. There was no evidence whatsoever at trial to indicate that that was the case. Well, if you're selling something that is mislabeled and you're selling it in this very unique business where the importance of a specific lot and the number of the lot to ensure purity and consistency, doesn't that confuse the clients and customers of Atlas? I mean, isn't there a spin here? Your Honor, I understand where you're trying to go with that. The challenge is that there was just no evidence presented in any way to indicate that that was the case. That any customer was confused as to this product being related to Atlas or a connection between the company. That evidence just does not exist. Thank you. I've caused you to go over. All right. Well, thank you, Your Honor. Thank you. We're ready to hear from the appellee. Your Honor, John Root on behalf of Atlas Biologicals, the appellee. May it please court. Your Honor, I can take things up right here from the precise point you're asking counsel about. There is evidence in the record that that mislabeled serum was sold to 14 different Atlas customers, only one of whom was Dame Young. It's referenced in trial exhibit. I believe it's 168, but it's in the record. It's referenced in my brief. There is a rule 1006 summary exhibit that was stipulated to by counsel. It's got all of that information in there and it was brought on by the court. So what's the hook here? What's the relationship? You have you have Atlas customers that are buying from now a freestanding peak serum company, right? That's when these mislabeled products were sold. Right. It was after Peak Serum was created. And it started selling and it mislabeled a whole string of this product. That's right. And you have to go back to the issue of initial confusion that's created during the term of Mr. Ketrubis's employment when he's equating the two companies, falsely equating the two companies, calling them sister companies, directly comparing Atlas's products to future products that will be sold by Peak Serum using Atlas's trademarks, both registered and unregistered in that process, and also making false misrepresentation or misrepresentations about Atlas's products. And, you know, this is really interesting point for one reason I want to be sure to bring up. And that's that's the standard of review here. If you read Judge Argoia's opinion carefully, you realize that the analysis of the mislabeling relates to Judge Argoia's decision on damages. And this is really, really important because the you know, recently, I believe it was in the Lexmark case. The Supreme Court referenced the damages determinations in a Lanham Act case as being cabined in principles of equity. And you go back to the, you know, other cases that talk about the standard of review for damages determination. They talk about a abuse of discretion standard. And so when you're looking at a court analyzing how to craft a remedy in a Lanham Act case, those decisions are based on an abuse of discretion review. And here you have all kinds of evidence that support a reasonable basis for the court to make a decision that it did based on the facts that were in front of it. Based on that standard of review. Judge Argoia certainly orders disgorgement based on unjust enrichment. And I can see how your argument would relate to, you know, the amount of disgorgement. But if I understand correctly, she specifically found that there was an unfair competition and false designation of origin predicate for liability based on the mislabeling of the origin of this lot. And I do not understand, and just so I'm going to give you a chance to walk me through it, of why the fact that Peak Serum was selling mislabeled lots to Atlas customers. What was it about that mislabeling of the origin of the lot that created confusion with Atlas customers? You've got the 2014 emails. I understand that creates confusion. I understand what you call hijacking or using the Google Plus platform. I understand that. What I don't understand is how it insinuates a relationship with Atlas that he misdesignated the lot in which he acquired this FBS. Two issues there. First of all, I do think that the discussion related to damages. But with respect to the liability issue, Section 43A of the Lanham Act actually has two prongs. And this isn't as clearly articulated as you might like in the district court's opinion. But the first prong is, you know, generally referred to as a false association prong. And that's where you get into the issue with the emails, the Google Plus account, those things. The second prong is a false advertising prong. Now, you have to be careful about that phrase, false advertising, because it's a little bit over-inclusive if you look at the language there. Because what the statute actually says is in Section 1125A1B, in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her goods. And that's where this mislabeling issue is really significant, because in this industry, it's critically important. For example, if you want to export serum to South Korea, it has to meet certain origin requirements. It has to originate from the United States. So if you go to the USDA, like Mr. Ketrubis did here, and you present a certificate to, you know, a signed certificate to the USDA saying this serum, this lot, is composed entirely of this other lot, it's U.S. origin, it meets the qualifications, and the USDA gives its go-ahead, and then it's exportable. But then if you turn around and you fill that lot with a bunch of other serum, you've lost the ability as a consumer of that product to actually know what the geographic origin is. Similarly, in the marketing – There are limited quantities of product available at any given time. And so if I'm a customer and I go to you and you say, hey, you know, I've got Korean-eligible serum that I want to sell, and you say, hey, I need 600 liters, but I've only got 200 liters of Korean-eligible serum, and I say, yeah, I can fill your order, and then I mislabel it so I can sell you 600 bottles of who knows what, that's where the damage comes in. And this is referenced in the Palm Wonderful case. You can have mislabeling that causes damage to a competitor because it'll induce a consumer to purchase something that's different from what they think. And this is a really clear example of that because you have an order that gets filled because it's mislabeled, because there's a volume there. And it's not just one customer, mind you. It's 14 different customers that purchase this mislabeled serum. Now, if Ketrubis doesn't have that lot, really, then maybe the customers go elsewhere to find it. And these customers that we're talking about are all Atlas customers, all Atlas customers who have had a history of making purchases from Atlas of the product that's used for the same purpose, cell culture. And what you just argued will be made plain to us if we read this record, top to bottom? Yes, it would be. The other thing to keep in mind here is that, you know, what we're really talking about, you know, there's been a lot of attention paid to this one discrete issue of mislabeling. But really, you know, the lion's share of the damages in this case relate to the first prong related to the likelihood of confusion. And, you know, there's the case that discusses statutory standing for a Lanomag claim, the Lexmark case. One of the statements that's made in there, clear as a bell, is, as we've observed, a defendant who seeks to promote his own interests by telling a known false auteur about the plaintiff or his product may be said to approximately cause plaintiff's harm. And what you have here in this case is you have many misrepresentations. And if you review the record in its entirety, you will see that. And you will see that the court had a lot of evidence on which it could reasonably conclude that those misrepresentations caused damage to Atlas. And that's just the Lanomag portion of the claim. You also have the trade secrets portion of the claim. And that has to do with taking customer lists, taking database information, taking sales history. You have to look at the whole ball of wax here to really understand that what happened here was a multi-pronged attack by Ketrubas against Atlas that included making misrepresentations, included falsely equating his company to Atlas, included trademark infringement, included misappropriating customer lists, customer sales information, and then using all of that information to take business from Atlas. And when you look at it in context, you can clearly see that what's going on here is not just, you know, a typical negligent sort of trademark infringement that can just as easily lead to damages under the Lanomag Act, but an intended and desired act that resulted in damages to Atlas in the form of lost sales. Well, is there any dispute here that these acts were not willful? I don't think there's any dispute that the actions were willful. And that also leads to another issue, which is that the Porous Media case and many other cases really within trademark and trade secret jurisdiction indicate that if you engage in willful acts, there's a presumption of causation. And it makes sense. You know, if you go back to the Lexmark case, one of the things that Justice Scalia said in that case is that we're using principles of traditional causation analysis to look at this. And one of the things that you see in causation cases across the board is when you have willful acts, there is a presumption of causation. Another issue, and, you know, Mr. Ward alluded to it, is, well, you know, what about Atlas terminating one of the, you know, about four or five dozen customers that are at issue in this case? Well, you know, if you look at the record, you'll see that was in the context of Ketrubis trying to get a straw purchase set up with another customer. And then when Dame Young comes out of the blue and suddenly wants to order the proprietary product, when they've gone silent for a while, it made Atlas fearful that that was what was going on. And that's another traditional approximate cause analysis is the principle that when the defendant is engaging in other behavior that causes the plaintiff to innocently act in a way to protect itself, you don't have an interruption of causation in that situation. So, you know, overall, I think the most important thing in this case is to remember that the standard of review here for the damages issue is the abuse of discretion standard, but for the other facts, it's that clear error standard. And under both of those standards, there is so much evidence in this record showing that what Mr. Ketrubis did was intentional, it was desired, and that it had its intended effect. He got a huge, about 25 to 30 percent of Atlas's business through his wrongful conduct. Do we have any actual debate or maybe we do have a debate whether or not our appeal involves the amount of attorney fees that has subsequently been awarded by the district court? No, Your Honor. I don't think that it can. And the reason for that is that the award of attorney's fees was actually entered after the original notice of appeal in this case was filed and no subsequent notice of appeal on the attorney fee award was ever filed. And so the only question as far as attorney fees is involved is whether or not the court should have entered an order to award fees, not the amount. Right. That's my position, Your Honor. Yes. Thank you. Your Honor, I think one, you know, I see my time is nearly up. If there are no more questions, then I'll conclude at this point. I do have a question, but I want to defer to my colleagues. Go ahead. Go ahead. So I don't want to be a dead horse, but I do have one follow up again on this hundred eighty one thousand dollars on the mislabeling. You mentioned false advertising. Is it your position or would you concede that if it is analyzed under a false designation of origin theory that you would concede that Mr. Ward is correct that there is no evidence to support a false designation of origin by virtue of associating the mislabeling of origin of this lot with Atlas? But if we analyze it in a false advertising theory, there is evidence to support what Judge Arguello said on page thirty one. Is that my misstating it or is that your final take on it? You know, your honor, I think that you can you can analyze it. I see my time is up, but will you allow me to answer your question? Yes. I think that there are there are really three modes of analysis that could potentially get you to the same result on that issue. The first one is under that false advertising problem, because what essentially or excuse me, under the false association problem, essentially what you're doing is you're inducing a customer to purchase product because you're saying, look, you know, it comes from its U.S. origin product or it has certain biochemical certain biochemical profile as indicated on the labeling. And when you do that, you're potentially you are taking business from another seller, in this case, Atlas, because you have all of the evidence. These are customers that came out of that database information that was taken by Katrubas. That's all referenced in that summary spreadsheet, that rule one zero six summary spreadsheet that's in the record. And so you can you can easily make that conclusion under the first prong based on that. The second issue is a damages analysis. Remember that, you know, you can find that there was a likelihood of you can find that there was a false association liability and then get to the stage of evaluating damages and look at the situation. Look at the mislabeling and all cabined within principles of equity. Make a determination that this is a fair way to enhance damages based on the circumstances. And then the third potential way that you can reach that conclusion is to look at it under the false advertising prong of Section 11. Twenty five a one. And that's where you're saying, look, you know, you're you are falsely stating that this is all within one lot, that it's Korean eligible serum. And therefore, that causes or induces. I understand. Customer to buy the product. Thank you so much. Thank you, Mr. Ward. Do you have any rebuttal? I'll give you two minutes since the council went over. I appreciate that your honor. Just just briefly, you know, going back to this mislabeling of product as as Mr. Root indicated, we're not talking about solely Dame Young, and that's not lost on on me at all. But the fact remains is that the the record was void of any evidence to indicate that customers were confused as a result of this mislabeling issue that the evidence just does not exist. And I welcome you to review the entire record because you as well will see that it does not exist. When it comes to Mr. Root indicated a couple of a couple of cases that can be instruct instructive here. And that's the the Udall case. Bear with me just a second here. He indicates the Udall case and as well as the poorest case. Now, those are cases that are clearly distinguishable from what's going on here. For instance, in the Udall case, we're looking at an instance where a defendant engaged in a national campaign of deceptive and misleading price comparison between it and Udall and U-Haul. And there's nothing like that that occurred in this case. We're talking about an ongoing effort to gain sales from U-Haul there. Similarly, in the poorest case, which Mr. with Mr. Root had referenced again, that's a that that was a systematic concerted effort to disparage porous as products and make false comparisons between the defendant's product and porous as product. I mean, those those are the type of misrepresentations and advertising campaigns. Those just didn't occur in this this situation where the misrepresentations were confined or confined to pre pre termination from employment. And I see my time is up. So I appreciate the extra time. Thank you. Thank you both for your arguments this morning. The case is submitted.